**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEBORAH TROUDT, BRAD STAUF, SUSAN CUTSFORTH, WAYNE SELTZER, MICHAEL HARKIN, MIRIAM WAGNER, and MICHAEL FOY, individually and as representatives of a class of plan participants, on behalf of the Oracle Corporation 401(k) Savings and Investment Plan, | Case No. _____ |
| *Plaintiffs,* | COMPLAINT—CLASS ACTION |
| v. | |
| ORACLE CORPORATION, ORACLE CORPORATION 401(K) COMMITTEE, and JOHN DOES 1–20, | JURY TRIAL DEMANDED |
| *Defendants.* | |

## COMPLAINT

1.     Oracle Corporation breached its fiduciary duties in the management of its employees' 401(k) plan (the Oracle Corporation 401(k) Savings and Investment Plan ("the Plan")). Defendants, as fiduciaries to the Plan, which consists of Plan participants' retirement assets, have a fiduciary obligation to act for the exclusive benefit of participants and to make sure that fees are reasonable. Because the marketplace for retirement plan services is established and competitive, billion dollar 401(k) plans, like this Plan, wield tremendous bargaining leverage and can obtain high-quality investment management and administrative services at very low costs.

2.      Defendants, as fiduciaries to the Plan, are obligated to act for the exclusive benefit of participants, without self-interest, and to make sure fees are reasonable. They are held to the standard of a prudent financial expert familiar with the investment industry practices and fees. Defendants caused the Plan to pay recordkeeping and administrative fees to Fidelity that were multiples of the market rate for the same services. Defendants breached their fiduciary duties of loyalty and prudence and engaged in transactions expressly prohibited by ERISA.[1] By failing to act solely in the interest of Plan participants and failing to adequately monitor the investment options in, and service providers to, the Plan. Defendants also prevented participants in the Plan from discovering their breaches through a series of false and misleading communications to Plan participants.

3.      Plaintiffs, individually and as representatives of a class of participants in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a), to make good to the Plan all losses resulting from each breach of fiduciary duty, and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of ERISA's fiduciary duties and other such equitable or remedial relief for the Plan as the Court may deem appropriate.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

## JURISDICTION AND VENUE

4.     This Court has federal question subject matter jurisdiction under 28 U.S.C. §1331 because this is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

5.     This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where at least one Defendant may be found. All Defendants are subject to nationwide service of process under 29 U.S.C. §1132(e)(2).

## PARTIES

### Oracle Corporation 401(k) Savings and Investment Plan

6.     Oracle Corporation ("Oracle") is a publicly-traded, Delaware corporation with major operations in this District and throughout the United States. Oracle employs more than 130,000 people and generates over $38 billion in revenue. Oracle acquired Sun Microsystems in 2009 and, at the time, Colorado was the second largest operation for both companies. Since 2009, Oracle has increased its presence in the state by acquiring companies based in Colorado.

7.     Oracle established and maintains the Plan for its eligible employees. Oracle is the Plan sponsor under 29 U.S.C. §1002(16)(B). Oracle operates its business and employs individuals (including Plaintiffs) in Boulder, Colorado; Brush, Colorado; Fort Collins, Colorado; Loveland, Colorado; Sterling, Colorado; and Greeley, Colorado and thus may be found in this district.

8.     As required by 29 U.S.C. §1102(a)(1), the Plan is established and maintained by a written plan document titled "Oracle Corporation 401(k) Savings and Investment Plan." The Plan was originally created as a profit-sharing retirement plan in 1986. The Plan document has been amended and restated repeatedly, most recently on January 1, 2014.

9.     All employees of Oracle and certain of its affiliates are eligible to participate in the Plan with the possible exception of certain employees covered by collective bargaining agreements.

10.     The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34).

11.     The Plan held $12,111,912,892 in assets and had 65,732 participants with account balances as of December 31, 2014. The Plan is one of the country's largest 401(k) plans, in assets, larger than 99.99% of all 401(k) plans.

12.     The Plan document identifies Oracle as the named fiduciary of the Plan under 29 U.S.C. §1102(a) and the Plan administrator under 29 U.S.C. §1002(16)(A). The Plan document grants Oracle discretionary responsibility for the administration of the Plan.

13.     The "Committee" (undefined in the Plan document) is the named fiduciary under 29 U.S.C. §1102(a) with respect to: (1) the interpretation of the Plan; (2) the formulation of rules necessary to administer the Plan; (3) the final determination of participant claims; and (4) the establishment and implementation

4

of a funding policy and method for the Plan.  The Trust Agreement, described below, identifies the Committee as the Oracle Corporation 401(k) Committee.

14.     Oracle is responsible for choosing the investment line-up for the Plan, in which participants can invest. The Committee only has authority to make recommendations to Oracle regarding investments. Any delegation by Oracle to the Committee of its authority to make decisions regarding Plan must be in writing.

15.     Plaintiffs requested all documents related to the governance and oversight of the Plan under 29 U.S.C. §1024(b)(4) and 29 CFR 2550.404c-l. If Oracle delegated any of its fiduciary responsibility, they would be required to be produced under §1024(b)(4). Oracle did not produce any delegation documents in response to Plaintiffs' request.

16.     While the Senior Vice President of Oracle America, Inc., a subsidiary of Oracle, nominates members of the Committee, the Compensation Committee of the Board of Directors for the Company has ultimate authority over Committee membership.

17.     In accordance with 29 U.S.C. §1103(c), the Plan document requires all Plan assets to be held in trust by a trustee appointed by Oracle. Oracle entered into a Trust Agreement with Fidelity Management Trust Company that was originally dated December 31, 1993 and most recently restated on February 1, 2003.

18.     Fidelity Management Trust Company, Inc. provides recordkeeping and administrative services to the Plan as described in the 2003 Trust Agreement. Several Fidelity entities provide or have provided services to the Plan, including

Fidelity Management & Research Company, which is the investment adviser for Fidelity mutual funds. All Fidelity entities, along with their affiliates, subsidiaries, parents, and otherwise will be referred to as "Fidelity."

19.     Fidelity's services to the Plan are performed in multiple states, including Massachusetts, Ohio, and Colorado.

20.     Section 5(b) of the Trust Agreement states that the Committee as a named fiduciary shall direct the Trustee as to the investment options that will be offered in the Plan and limits those options to (1) mutual funds, (2) Oracle stock, (3) participant loans, and (4) Fidelity collective trusts. The investment options selected by the Committee (or Oracle) are listed on Schedule C of the Trust Agreement.

21.     Large shareholders of a company have significant influence over corporations for a variety of reasons:

      A.     They can vote their shares to support or oppose management;

      B.     They can affect the company's stock price based on their holding or selling large blocks of the company's stock; and

      C.     They have significant influence over executive compensation and bonuses, particularly if the compensation or bonus is based on share price.

22.     Fidelity is the sixth largest institutional holder of Oracle stock, owning over $2 billion shares. Thus, Fidelity has the influence of a large stockholder in light of its stock ownership.

23.    Oracle has chosen and maintained funds from one of its largest shareholders, Fidelity, to be investment options in the Plan. Oracle has also chosen Fidelity to provide recordkeeping services to the Plan. Because of these choices by Oracle, Fidelity has received, and continues to receive, millions of dollars of Plan participants' retirement assets.

## Plaintiffs

24.    Plaintiff Deborah Troudt resides in Boulder, Colorado. She formerly worked for Oracle as a Business Analyst in Operations and remains a participant in the Plan under 29 U.S.C. §1002(7) because she or her beneficiaries are eligible to receive benefits under the Plan.

25.    Plaintiff Brad Stauf resides in Louisville, Colorado. He is a Pre-Sales Engineer for Oracle and is a participant in the Plan under 29 U.S.C. §1002(7) because he or his beneficiaries are eligible to receive benefits under the Plan.

26.    Plaintiff Susan Cutsforth resides in Milwaukee, Wisconsin. She retired from her position as Senior Principal Consultant at Oracle and was a participant in the Plan until 2014, when her account balance was distributed from the Plan. Ms. Cutsforth nonetheless is entitled to receive benefits from the Plan in the amount by which her account would have increased in value as of the time of the account distribution had Defendants not breached their duties as alleged herein or had Defendants performed their duties under 29 U.S.C. §1109(a) before that date.

27.     Plaintiff Wayne Seltzer resides in Boulder, Colorado. He is a Business Analyst for Oracle and is a participant in the Plan under 29 U.S.C. §1002(7) because he or his beneficiaries are eligible to receive benefits under the Plan.

28.     Plaintiff Michael S. Harkin resides in Dublin, California. He is an Oracle Support, Enterprise Account Manager for Oracle and is a participant in the Plan under 29 U.S.C. §1002(7) because he or his beneficiaries are eligible to receive benefits under the Plan.

29.     Plaintiff Miriam Wagner resides in Chicago, Illinois. She retired from her position as a Director of Sales at Oracle and remains a participant in the Plan under 29 U.S.C. §1002(7) because she or her beneficiaries are eligible to receive benefits under the Plan.

30.     Plaintiff Michael E. Foy resides in Broomfield, Colorado. He is a Principal Design Engineer for Oracle and is a participant in the Plan under 29 U.S.C. §1002(7) because he or his beneficiaries are eligible to receive benefits under the Plan.

## Defendants

31.     Oracle is the named fiduciary of the Plan under 29 U.S.C. §1102(a) and the Plan administrator. It also is a functional fiduciary under 29 U.S.C. §1102(21)(A) because it has discretionary authority and control over the investment options made available to Plan participants and over the hiring, monitoring, and removal of Plan service providers such as the trustee and recordkeeper. Oracle also exercises authority and control over Plan assets.

32.     The Plan document provides for a Committee to serve as a named fiduciary primarily for purposes related to claims for benefits under the Plan document.  The Committee is also given "nonfiduciary administrative functions," including making recommendations to the Company for decisions related to Plan administration and investing Plan assets, if so delegated by the Company.

33.     The Senior Vice President of Oracle America, Inc. nominates members of the Committee.

34.     The actions taken by the Committee and other Oracle officers, directors, employees, agents, affiliates, subsidiaries, and committees, as to the Plan were, and are, actions on behalf of and thus the actions of Oracle.

35.     Plaintiffs are currently unaware of the identities of the Senior Vice-President of Oracle America Inc. or the individual members of the Committee. Those individuals are collectively named as John Does 1–20. Plaintiffs will substitute the real names of the John Does when Plaintiffs know them.

36.     The fiduciary functions allocated to Oracle and the Committee are described in contradictory ways in the governing Plan documents. Who actually exercises what fiduciary functions has not been disclosed to participants. Therefore, all Defendants are collectively referred to in the paragraphs below.

**ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS**

37.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. The statute states, in relevant part, that, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of

the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. §1104(a). The standard for the level of expertise to which fiduciaries are held is that of a prudent expert in financial matters. *See, e.g. Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

38.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. "[A] fiduciary of a defined contribution, participant-driven, 401(k) plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants—must exercise prudence in selecting and retaining available investment options." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007). In determining whether a fiduciary has selected investments prudently, courts "examine the totality of the circumstances[.]" *Id.*

39.     ERISA fiduciaries selecting plan investments and service providers "must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries.'" *Id.* at 418–19. "Corporate officers must 'avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation

will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.'" *Id.* at 419 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

40.    ERISA also imposes co-fiduciary liability on plan fiduciaries. Under 29 U.S.C. §1105(a), in addition to any liability for its own breach, a fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

41.    The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . .

. (C) furnishing of goods, services, or facilities between the plan and party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . ..” Section 1106(b) provides, in pertinent part, that “a fiduciary with respect to the plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.”

42.     Under 29 U.S.C. §1109(a), “[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.” 29 U.S.C. §1132(a)(2) empowers any plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109 on behalf of the plan.

43.     29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary “party in interest” who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary’s duty, and authorizes

"appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## FACTS APPLICABLE TO ALL COUNTS

### Defendants had no prudent process for selecting and retaining prudent and loyal investment options.

44.     In a defined-contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options that plan fiduciaries provide, less expenses. See 29 U.S.C. §1002(34); *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1826 (2015). Poor investment performance and excessive fees can significantly impair the value of a participant's retirement account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See*, *e.g.*, U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013) (1% difference in fees over 35 years reduces a participant's account balance at retirement by 28%).

45.     Here, Defendants controlled the investments in which Plan participants could place their retirement assets. Prudent and loyal fiduciaries evaluate each plan investment option to ensure it is and remains a prudent investment for participants' retirement savings. A prudent process involves an analysis of investment style, historical performance, fees and expenses, manager skill and tenure, and appropriate investment vehicle (mutual fund, collective trust, separate account), among others. The Supreme Court has recently made it very clear that this analysis must continue throughout the time that the investment

options remain in the Plan, since fiduciaries have an ongoing duty to monitor the prudence of plan investment options and remove imprudent ones. *Tibble*, 135 S.Ct. at 1828–29.

46.     Despite the fact that 401(k) plan fiduciaries are held to the standard of prudent financial experts and must act for the exclusive benefit of participants in screening and selecting a menu of investment options, Defendants provided at least 3 imprudent investment options. These imprudent investment options, described below, consistently underperformed their designated benchmarks, consistently underperformed the majority of other funds of the same investment style, charged excessive fees, and paid revenue sharing to Fidelity far beyond a reasonable rate for the services provided.

47.     401(k) plan fiduciaries are required to individually analyze for prudence each investment option made available to participants. *DiFelice*, 497 F.3d at 423–24. Defendants failed to engage in a prudent and loyal fiduciary process to select and maintain only prudent and reasonably priced investments as Plan investment options.

**Defendants caused the Plan to pay excessive recordkeeping fees.**

48.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are capable of providing a high level of service to a jumbo 401(k) plan like this Plan. These vendors primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

Recordkeeping vendors will readily bid for servicing a jumbo plan, such as Oracle's 401(k) Plan, on a flat, low, per-participant fee basis, if plan fiduciaries put plan recordkeeping services out for competitive bidding.

49.     Numerous recordkeepers only provide recordkeeping services and do not sell investment products. These vendors do not link proprietary investment products to their provision of recordkeeping services.

50.     Unlike recordkeepers who do not sell investment products, Fidelity's primary business is selling investment products. The primary method of payment to Fidelity for its recordkeeping services for the Plan has been an asset based fee and not a flat, per-participant fee.

51.     Fidelity has been the recordkeeper for the Plan since 1993. Defendants have not informed participants that they have not put the Plan's services out for competitive bidding in the last 26 years.

52.     Prudent fiduciaries engage in a competitive bidding process for plan recordkeeping and administrative services about every 3 years. A competitive bidding process results in a negotiated recordkeeping contract that provides the desired services at the lowest cost available in the market. It causes recordkeepers to submit their best bids because they know the process is a competition. Defendants failed to engage in such a process for over 25 years. Had they done so, they would have entered into a recordkeeping arrangement for the Plan that provided the same recordkeeping services at a substantially lower cost.

53.     The per-participant cost of providing recordkeeping services does not depend on the amount of money in participants' accounts. Thus, the cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of an asset-based percentage of plan assets. Setting recordkeeping fees, or allowing them to be paid, on the basis of a percentage of plan asset values can result in excessive recordkeeping fees because, as plan assets increase (such as through participant contributions and gains on investments), recordkeeping compensation increases without any change in recordkeeping services. That is what Defendants did. Defendants caused the Plan to pay its recordkeeper, Fidelity, with uncapped asset-based fees paid by the participants out of the expense ratios of the investment options in the Plan. Defendants have not negotiated a reasonable, fixed fee per participant for the Plan's recordkeeping and administrative services. This breach of fiduciary duty has caused the Plan to incur unreasonable expenses of administration.

54.     Mutual funds have thousands of shareholders and their expense ratio includes a portion for recordkeeping those thousands of shareholders' accounts. However, since a mutual fund in a 401(k) plan has only one aggregate amount to track, the recordkeeping must be done by the plan for each participant. In these circumstances, some mutual funds engage in a practice known as revenue sharing.

55.     In a revenue sharing arrangement, a mutual fund pays part of the mutual fund's asset-based fees to certain recordkeepers. Most of the funds in this Plan make and have made undisclosed revenue sharing payments to Fidelity ranging from 3 to 40 basis points (bps) (0.03%–0.40%). As much as 50% of the asset-based expense ratio of Fidelity equity mutual funds and 90% of the asset-based expense ratio of Fidelity money-market funds are allocated to the Fidelity entity that provides Plan recordkeeping or other administrative services.

56.     While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services a mutual fund otherwise would have provided, the payments can effectively be kickbacks for including the fund in a plan's investment lineup because the amount of revenue sharing paid due to large plan investments in mutual funds can exceed reasonable compensation for the services provided. This excess over a reasonable fee is particularly likely since revenue sharing is asset-based and thus prone to increase as plan assets increase through contributions and investment growth, even though recordkeeping services do not. Some recordkeepers, such as Fidelity, also sell investment products and recommend that plan fiduciaries use funds that provide substantial revenue sharing, such proprietary or affiliated funds.

57.     In a plan that allows revenue-sharing payments to its recordkeeper from mutual funds that are investment options, a prudent and loyal fiduciary monitors that revenue sharing to ensure that the recordkeeper does not receive total compensation from the plan exceeding a reasonable, per-participant

recordkeeping fee. If it does, a prudent and loyal fiduciary compels the recordkeeper to refund to the plan all revenue sharing it receives that exceeds a reasonable, flat recordkeeping fee. Such monitoring also applies to all other sources of compensation that the recordkeeper may receive, such as float and direct payments by the Plan or its participants. Defendants failed to adequately monitor all sources of Fidelity's compensation, including float and direct payments by the Plan or participants, causing the Plan to pay excessive recordkeeping and administrative fees.

58.    Defendants could have, and should have, requested information from Fidelity as an integral part of satisfying their fiduciary duty to ensure that participants avoid paying unreasonable fees.  Fidelity maintains documents that summarize Fidelity's compensation such as: fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand alone pricing reports.

59.    For purposes of a plan's annual report filed with the Department of Labor (a/k/a Form 5500), revenue sharing payments are classified as "indirect compensation," as distinguished from "direct" payments from the plan. In the Plan's annual reports, Defendants reported the percentage of revenue sharing Fidelity received but failed to disclose the asset amounts for many of the funds listed on the over 200 page disclosures, despite being obligated to do so. By deliberately failing to disclose the asset amounts Defendants concealed the amount of Fidelity compensation. This made it impossible for participants, the Department of Labor, or

the public to know the amount of fees being paid. Thus, Defendants concealed their breaches from participants.

60.     As to the portion of the information disclosed, based on known revenue sharing rates and the amount of reported direct compensation from the Plan, Fidelity received at least the following approximate amounts of combined direct and indirect compensation for recordkeeping from 2009 through 2013: 2009—$5.3 million; 2010—$8.1 million; 2011—$7.7 million; 2012—$8 million; 2013—$4.3 million.[2] These amounts were unreasonable and excessive. The precise amount of compensation paid to Fidelity by the Plan cannot be determined because the Defendants have not disclosed it, as is required by the Department of Labor. The Plan continues to pay excessive amounts to Fidelity. These amounts far exceed reasonable compensation based on the per-participant rate that this Plan could have obtained for the same services. A reasonable recordkeeping and administrative fee for the Plan would be approximately $25 per participant, which is based on the nature of the administrative services provided by Fidelity, the approximate number of Plan participants (38,000 in 2009 and 60,000 since 2010), and the recordkeeping market. Based on information currently available, the Plan paid approximately *$68 to $140* per participant per year from 2009 through 2013 for recordkeeping and

---

[2] In 2013, Fidelity received compensation of at least $9.3 million.  The Form 5500, however, seems to indicate that $5 million was returned to the Plan.  Even if this is the case, the $4.3 million that remained as compensation to Fidelity resulted in excessive and unreasonable compensation for the services provided to the Plan, as described below.

administrative services, up to *170%-460% higher* than a reasonable fee for these same services.

61.     In addition, Fidelity also received revenue from float interest, short term trading fees that were applied to many of the Plan's investment options, finders fees, brokerage window fees, revenue sharing from investments through the brokerage window, and other sources of income related to the Plan or its investments.

62.     From the beginning of 2009 to year-end 2014, the Plan's assets more than tripled from $3.6 billion to over $11 billion. Because revenue sharing payments are asset-based and because Defendants chose to pay asset based recordkeeping fees, rather than a flat per-participant fee as the recordkeeping market readily does, Fidelity's revenue skyrocketed even though the services it provided to the Plan remained the same.

63.     Defendants failed without good cause to put the Plan's recordkeeping compensation out for competitive bidding on a prudently regular basis. Defendants also failed to prudently monitor and control Fidelity's total recordkeeping compensation, particularly asset-based, uncapped revenue sharing, and caused the Plan to provide Fidelity excessive recordkeeping compensation for the services provided. This resulted in losses to the Plan exceeding $40 million.

**Defendants imprudently selected and retained poorly performing funds.**

64.     Defendants selected and failed to remove mutual funds whose performance was poor or management tenure insufficient.

65.     Selecting investment options for plan participants that have minimal performance history is wholly contrary to the most basic prudent fiduciary practices. When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. Consistent performance history and investment strategy, among other factors, demonstrate the potential of the investment manager to generate superior long-term investment results compared to the fund's benchmark or peer group of managers with similar mandates.[3] At a minimum, prudent fiduciaries require a 3-year performance history for an investment option prior to its inclusion in a 401(k) plan. As set forth in further detail below, there was no prudent or loyal reason to select a fund without an adequate performance history.

66.     The Artisan Small Cap Value Fund (APHVX) ranked at the very bottom of its class for 4 out of 5 years (96th, 98th, 94th, and 97th percentiles) before it was removed in June 2015.  The Artisan Small Cap Value Fund greatly underperformed its benchmark 4 out of the most recent 5 years, resulting in tens of millions of dollars of losses to the Plan.

---

[3] Fiduciaries always have available index funds, as opposed to choosing active management, within any investment style. These low-cost options simply invest in stocks listed on a particular index in the same proportion as they comprise the index. They have low costs because the manager of the fund does not research individual stocks.

67.     The consistent underperformance of the Artisan Small Cap Value Fund is further demonstrated based on the fund's investment performance compared to its benchmark over the 1, 3, and 5 year periods ending June 2015.



68.     If the Plan had been invested in a prudent alternative in the small cap space, like the Vanguard Small-Cap Value Index Fund (VSIIX), the Plan would have avoided over $70 million in losses.



69.    The PIMCO Inflation Response Multi-Asset Fund (PIRMX) was created on August 31, 2011. A year and a half later, it was added to the Plan without an adequate performance history. Thus, there was no prudent process and or adequate track record for selecting this fund, which was an imprudent option for Plan participants. This balanced fund dramatically underperformed the Fidelity Balanced Fund (FBAKX), which was already in the Plan.



70.    If the Defendants had not imprudently added the PIMCO Inflation

Response Multi-Asset Fund, the Plan would have avoided significant losses.



71.     Similarly, the TCM Small-Mid Cap Growth fund was created in June 2007 and added to the Plan barely 2 years later without an adequate performance history. In the only year of performance available to fiduciaries when they selected this fund (2008), it underperformed its benchmark by over 5%. Subsequently, the fund underperformed its benchmark every year that it was in the Plan, causing significant losses for the Plan.



**Defendants concealed their fiduciary breaches.**

72.     Defendants concealed their breaches of fiduciary duty and other ERISA violations through a series of false and misleading statements and by omitting disclosure of material information. This prevented Plaintiffs from discovering Defendants' breaches and violations.

73.     Beginning in the 2009 plan year, Defendants were required to report annually to the Department of Labor all direct and indirect compensation received by each of the Plan's service providers. While each year Defendants reported that Fidelity received indirect compensation, and that there was a formula to determine this compensation, Defendants failed to provide the required asset levels necessary to complete the formula or the amount of the indirect compensation in their annual Form 5500 public filing to the Department of Labor.[4] Thus, participants had no way of knowing the amount of Fidelity's indirect compensation.

74.     Defendants concealed from the government regulatory body, participants, and the public critically important information required by the Department of Labor for enforcement of ERISA requirements and prevented participants from discovering the excessive compensation paid by the Plan to Fidelity.

75.     Because of the specialized nature of the information needed to understand the nature and extent of the excessive fees and imprudent investments that Defendants imposed upon the Plan, Plaintiffs could not have discovered

---

[4] Investment managers and fund companies sometimes negotiate a percentage of assets invested by a particular plan (often expressed in basis points) that they will share with the recordkeeper. To determine Fidelity's indirect compensation from these managers or fund companies, the basis points must be multiplied by the assets to determine the dollar amount paid to Fidelity. While Defendants knew the asset amounts invested in each option and the basis points from each options shared with Fidelity, they concealed a crucial part of this formula from the Department of Labor and participants, making it impossible to know the full amount of Fidelity's total compensation.

Defendants' breaches through the exercise of reasonable diligence any sooner than within 6 years before filing this complaint.

## CLASS ACTION ALLEGATIONS

76.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. §1109(a).

77.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. In light of Defendants' concealment of their misconduct, Defendants' fiduciary breaches and other ERISA violations went undetected for years, and Plaintiffs are entitled to recover for the harm caused during the time that the breaches were concealed. While Defendants' long campaign of imprudent conduct in managing the Plan likely began even earlier, the starting date for the class is January 1, 2009. Plaintiffs will move for certification of a class that commences on the earliest date for which Defendants may be held liable for their breaches. Presently, Plaintiffs seek to certify the following class, and to be appointed as representatives of the class:

> All participants and beneficiaries of the Oracle Corporation 401(k) Savings and Investment Plan from January 1, 2009 through the date of judgment, excluding the Defendants.

78.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 30,000 members, which is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries. Defendants took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Defendants' actions in doing so were the same actions as a whole for each Plan participant affected. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the Plan's fees are excessive; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.   Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the

Class, and have engaged experienced and competent attorneys to represent the Class.

e.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore this action should be certified as a class action under Fed.R.Civ.P. 23(b)(1)(A) or (B).

79.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter. Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter

as a class action. Alternatively, then, this action may be certified as a class under Fed.R.Civ.P. 23(b)(3) if it is not certified under Fed.R.Civ.P. 23(b)(1)(A) or (B).

80.     Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.  Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). In another 401(k) fee case, the District Court stated: "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

b.  U.S. District Court Judge G. Patrick Murphy recognized the work of

Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill.

Nov. 22, 2010).

c.  Schlichter, Bogard & Denton handled the only full trial of an ERISA

excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was

affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir.

2014). In awarding attorney's fees after trial, the district court concluded that

"Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*,

No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following

remand, the district court again awarded Plaintiffs' attorney's fees emphasizing the

significant contribution Plaintiffs' attorneys have made to ERISA litigation,

including educating the Department of Labor and courts about the importance of

monitoring fees in 401(k) plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan

participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d.   Schlichter, Bogard & Denton is also class counsel in *Tibble*, 135 S. Ct. at 1829, in which the Supreme Court held, in a unanimous 9–0 decision, that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will have a broad effect on 401(k) plans.

e.   The firm's work in ERISA excessive fee class actions has been covered by the New York Times and Wall Street Journal, among other media outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[5]  Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[6]  Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[7] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015);[8] Jim Zarroli, *Lockheed*

---

[5] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[6] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[7] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[8] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

*Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[9] Darla Mercado,

*Public Enemy No. 1 to 401(k) Profiteers*, INVESTMENTNEWS (Jan. 26, 2014).[10]

### COUNT I

### Breach of Duties of Loyalty and Prudence
### Excessive Administrative Fees

81.   Plaintiffs restate and incorporate herein the allegations contained in

the preceding paragraphs.

82.   If a 401(k) plan overpays for recordkeeping services due to the

fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have

breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d

786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan

sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and

control recordkeeping fees" and "paying excessive revenue sharing" is a breach of

fiduciary duties. *Tussey*, 746 F.3d at 336.

83.   Defendants failed to engage in a prudent and loyal process for selecting

a Plan recordkeeper and administrator. Instead of soliciting competitive bids from

outside vendors on a flat per-participant fee basis or soliciting bids at all,

Defendants used Fidelity to provide these services to the Plan for over 16 years.

84.   Defendants failed to engage in a prudent and loyal process to ensure

that the compensation paid to Fidelity was reasonable for the administrative

---

[9] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[10] Available at http://www.investmentnews.com/article/20140126/REG/301269992/public-enemy-no-1-for-401-k-profiteers.

services provided to the Plan. Defendants allowed Fidelity to receive uncapped, asset-based revenue sharing, yet failed to monitor the amount of those payments to determine if they were reasonable. As the assets in the Plan grew, the revenue sharing payments to Fidelity grew by a similar percentage, even though the services provided by Fidelity remained the same to this Plan, and the number of participants in the Plan had increased only slightly. This caused the recordkeeping compensation paid to Fidelity to become even more excessive than it had been without any comparable increase in services.

85.     Through these actions and omissions, Defendants caused tens of millions of dollars in losses to the Plan at the expense of participants.

86.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, knew of the breaches by the other Defendants, failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by each breach of its co-fiduciaries under 29 U.S.C. §1105(a).

87.     Plaintiffs seek an accounting from Defendants to determine the full

nature and extent of the losses caused to the Plan and the profits Defendants

unlawfully gained and must make good to the Plan.

## COUNT II

### Breach of Duties of Loyalty and Prudence
### Imprudent Investment Options.

88.     Plaintiffs restate and incorporate herein the allegations contained in

the preceding paragraphs.

89.     Defendants failed to engage in a prudent process for the selection and

retention of Plan investment options. Instead, Defendants provided and retained

more expensive funds with inferior historical performance that paid revenue

sharing and generated investment management fee revenues for Fidelity. Had a

prudent and loyal fiduciary conducted such an investigation, it would have

concluded that the Plan's investment options were selected and retained for reasons

other than the best interest of the Plan and its participants and were causing the

Plan to lose tens of millions of dollars of participants' retirement savings in

excessive and unreasonable fees and underperformance relative to prudent

investment options available to the Plan. The Plan suffered over $40 million dollars

in losses from Defendants' breaches of duty.

90.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make

good to the Plan any losses to the Plan resulting from the breaches of fiduciary

duties alleged in this Count, to restore to the Plan any profits made through use of

Plan assets, and is subject to other equitable or remedial relief as appropriate. Each

Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by each breach of its co-fiduciary under 29 U.S.C. §1105(a).

91.     Plaintiffs seek an accounting of all participant investment transactions and the sources and recipients of all investment option fees, as well as other discovery, in order to determine the full nature and extent of the Plan's losses and Defendants' gains from this breach of duty, which Defendants must make good to the Plan.

## COUNT III

### Failure to Monitor Fiduciaries.

92.     Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

93.     Given that the Oracle Corporation had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Committee, Oracle had a fiduciary responsibility to monitor the performance of the other fiduciaries.

94.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

95.     To the extent any of Oracle's fiduciary responsibilities were delegated to another fiduciary, Oracle's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

96.     Oracle, thus, breached its fiduciary monitoring duties by, among other things:

    a.     failing to monitor its appointees, to evaluate their performance, or to engage in a prudent process for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.     failing to monitor its appointees' fiduciary process, which would have alerted a prudent fiduciary to the potential breach because of the numerous poor-performing investment options;

    c.     failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper; the amount of any revenue sharing payments, float, and any other sources of revenue derived from the Plan or its investments; a process to prevent the recordkeeper from receiving uncapped revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided

remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

        d.     failing to remove appointees whose performance was inadequate because they continued to maintain the imprudent options for participants' retirement savings in the Plan, and they continued to breach their fiduciary duties under ERISA.

97.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Oracle discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and other Plan participants, lost tens of millions of dollars of retirement savings.

98.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches; thus each Defendant is liable for the losses caused by each breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### 29 U.S.C. §1106(a)
### Prohibited Transactions between Plan and Party in Interest

99.     Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

100.     By causing the Plan to engage Fidelity to be the recordkeeper for unreasonable compensation, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C).

101.     By causing the Plan to engage Fidelity to be the trustee of Plan assets for unreasonable compensation, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C), and/or a transfer of Plan assets to a party in interest prohibited by 29 U.S.C. §1106(a)(1)(D).

102.     By causing the Plan to utilize imprudent and unreasonably expensive mutual funds and investments as Plan investment options, Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan

and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C), and/or a transfer of

Plan assets to a party in interest prohibited by 29 U.S.C. §1106(a)(1)(D).

103.    Under 29 U.S.C. §1109(a), these Defendants are liable to restore all

losses suffered by the Plan as a result of these prohibited transactions as well as

other appropriate equitable or remedial relief.

### JURY TRIAL DEMAND

104.    Plaintiffs demand a trial by jury under Fed.R.Civ.P. 38 and the

Constitution of the United States.

### PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and all Plan participants and beneficiaries,

respectfully request that the Court:

1. Find and declare that the Defendants have breached their fiduciary duties

and committed prohibited transactions in every instance alleged herein;

2. Find and adjudge that Defendants are personally liable to make good to the

Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duties or

prohibited transactions, and to otherwise restore the Plan to the position it would

have occupied but for the breaches of fiduciary duty;

3. Determine the method by which to calculate the losses to the Plan caused by

Defendants' breaches or profits gained by Defendants from their breaches and to

order Defendants to provide all accountings necessary to determine same, and upon

such calculation to compel Defendants to pay into the Plan all such losses;

4. Find and adjudge that Defendants must disgorge all sums of money received

from their use of assets of the Plan;

5. Impose a constructive trust on funds with which the Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions and cause the Defendants to disgorge such funds or the proceeds thereof to the Plan;

6. Remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

7. Compel Defendants to render all such accountings as are necessary to provide the Plan complete remedies to Defendants' breaches;

8. Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which were improper, excessive and/or in violation of ERISA;

9. Order equitable restitution against the Defendants;

10. Award to the Plaintiffs and the Class their attorney's fees and costs pursuant to 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11. Order the payment of interest to the extent it is allowed by law; and

12. Grant any other and further equitable or remedial relief, as the Court deems appropriate.

January 22, 2016                    Respectfully submitted,


                                   /s/      Jerome J. Schlichter
                                   SCHLICHTER, BOGARD & DENTON LLP
                                   Jerome J. Schlichter
                                   Michael A. Wolff
                                   Troy Doles
                                   Heather Lea
                                   Kurt Struckhoff
                                   100 South Fourth Street
                                   St. Louis, Missouri 63102
                                   Telephone: (314) 621-6115
                                   Facsimile: (314) 621-7151
                                   Email: JSchlichter@uselaws.com
                                   MWolff@uselaws.com
                                   TDoles@uselaws.com
                                   HLea@uselaws.com
                                   KStruckhoff@uselaws.com

                                   Attorneys for Plaintiffs