# IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Civil Action No. 16-cv-00175-REB-SKC

DEBORAH TROUDT, et al., individually and as representatives of a class of plan participants, on behalf of the Oracle Corporation 401(k) Savings and Investment Plan,

     Plaintiffs,

v.

ORACLE CORPORATION, et al.,

     Defendants.

---

## ORDER RE:  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**Blackburn, J.**

The matters before me are (1) **Defendants' Motion for Summary Judgment** [#134],[1] filed April 16, 2018; and (2) **Plaintiffs' Objections to Untimely Produced Documents Relied on by Defendants in Their Motion for Summary Judgment [#134]** [#155], filed May 22, 2018.  I overrule the objections.  I grant the summary judgment motion in part and deny it in part.[2]

## I.  JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (action to enforce rights under ERISA).

---

[1]  "[#134]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF).  I use this convention throughout this order.

[2]  The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument.  Thus, the motion stands submitted on the briefs.  *Cf.* FED. R. CIV. P. 56(c) and (d).  *Geear v. Boulder Community Hospital,* 844 F.2d 764, 766 (10th Cir.), *cert. denied*, 109 S.Ct. 312 (1988).

## II.  STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  **FED. R. CIV. P.** 56(a); **Celotex Corp. v. Catrett**, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A dispute is "genuine" if the issue could be resolved in favor of either party. **Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.**, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); **Farthing v. City of Shawnee**, 39 F.3d 1131, 1135 (10th Cir. 1994).  A fact is "material" if it might reasonably affect the outcome of the case.  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); **Farthing**, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine factual dispute.  **Concrete Works, Inc. v. City & County of Denver**, 36 F.3d 1513, 1517 (10th Cir. 1994), **cert. denied**, 115 S.Ct. 1315 (1995).  Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper.  **Concrete Works**, 36 F.3d at 1518.  All the evidence must be viewed in the light most favorable to the party opposing the motion.  **Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services**, 165 F.3d 1321, 1326 (10th Cir.), **cert. denied**, 120 S.Ct. 53 (1999).

## III.  ANALYSIS

In this class action, plaintiffs, individually and as representatives of other participants in the Oracle Corporation 401(k) Savings and Investment Plan (the "Plan"),

allege defendants breached their fiduciary duties in the management of the Plan, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et. seq.* The Plan is one of the largest in the country, with more than 65,000 participants and over $12 billion in assets. As a defined contribution plan, the Plan allows participants to contribute up to 40% of their compensation to the Plan, which Oracle matches. The Plan currently offers some 30 different investment options.

Defendant Oracle Corporation ("Oracle") is a named fiduciary of the Plan and a Plan administrator. Defendant Oracle Corporation 401(k) Committee (the "Committee"), composed of Oracle employees (the individually named defendants in this suit), is also a Plan fiduciary. In addition to its other duties, the Committee both monitors the fees paid to Fidelity Management Trust Company ("Fidelity"), the designated recordkeeper and trustee for the Plan, and guides the selection, monitoring, and removal and replacement of Plan investments. Those decisions are informed by an Investment Policy Statement ("IPS") (*see* **Motion App.**, Exh. A.4. at 267-273) and assisted by an independent consultant, Mercer Investment Counseling ("Mercer"), which assists the Committee in monitoring and managing the Plan's investment options and costs.[3]

Before addressing the substance of plaintiffs' claims, I first address their evidentiary objections to certain evidence submitted in support of the summary judgment motion and consider defendants' statute of limitations arguments.

## A. Evidentiary Objections

---

[3] Oracle also employs full-time benefits personnel who assist the Committee and handle the Plan's day-to-day operation. Their salaries and operating and other costs are paid by Oracle, not by the Plan.

Fact discovery in this case closed December 1, 2017.  Plaintiffs object to seven

documents produced by defendants after that date which are appended to and

referenced in the motion for summary judgment.  Specifically, these are

> (1)  A November 30, 2017, email to Peter Shott, Vice President of Human Resources at Oracle Corporation, from Troy Saharic, a consultant with Mercer Investment Counseling ("Mercer"), discussing recordkeeping fees for similar size plan sponsors (**Motion App.**, Exh. C.1. [#134-11] at 8-10);

> (2)  A February 2, 2018, email from Devon Muir of Mercer to Mr. Shott detailing recordkeeping fees paid by other large Fidelity clients (**Motion App.**, Exh C.2. [#134-11] at 11-13);

> (3)  A February 8, 2018, email to Mr. Shott from Jim Pujats of Fidelity offering to reduce the per-participant recordkeeping fee from $28 to $27 (**Motion App.**, Exh. C.3. [#134-11] at 14-16);

> (4)  The Plan's 2018 Participant Disclosure Notice provided to Plan participants by Fidelity, as required by 29 C.F.R. § 2550.404a-5, created March 12, 2018 (**Motion App.**, Exh. A.1. [#134-2] at 10-25);

> (5)  A copy of Mercer's February 14, 2018 "4th Quarter 2017 Investment Review" (**Motion App.**, Exh. A.2 [#134-2] at 26-107);

> (6)  A copy of the minutes for the November 8, 2017, Committee meeting[4] (**Motion App.**, Exh. A.3. [#134-2] at 262-265); and

> (7)  A copy of a presentation entitled "Driving Value" given by Mr. Pujats to members of the Committee on December 19, 2017 (**Motion App.**, Exh. A.20. [#134-5] at 1-31).

As should be readily apparent from this list, all but one of these documents

---

[4]  This document, although reflecting events occurring shortly before the close of discovery, was not created until March 5, 2018, after approval by the Committee at the February 14, 2018, meeting. (**See Def. Resp. to Obj. App.**, Exh. A ¶ 4 at 2.)

reflect events occurring *after* the close of discovery; the one exception is an email sent the day before the discovery deadline. As a matter of simple, linear time it was not possible for defendants to have produced these documents prior to the close of discovery.

Thereafter, parties have a duty under Rule 26(e)(1) to timely supplement their prior discovery disclosures, a duty about which plaintiffs specifically reminded defendants not two weeks after the close of discovery. More specifically, plaintiffs demanded defendants "supplement their production of Committee minutes and materials that were prepared by the Committee or third parties in connection with the meetings, including Mercer Investment Reviews. This would include materials prepared after the May 10, 2017 meeting." (**Resp. to Obj. App.**, Exh. A.1. [#163-1 at 5].)

In compliance with this request and their duties under Rule 26, defendants supplemented their responses in January (document #5 above), February (document #1 & #7 above), March (document #6 above), and April 2018 (document #2, #3, & #4 above). Plaintiffs do not object that these documents were not timely produced once they were created or received by defendants, and I see no basis to conclude otherwise. There thus is no basis to exclude this evidence under Rule 37(c)(1).

Plaintiffs objections based on hearsay and lack of foundation are wholly conclusory and completely undeveloped. I am neither required nor inclined to guess at the substance of such arguments. *See Healthtrio, LLC v. Aetna, Inc.*, 2014 WL 5473739 at *7 (D. Colo. Oct. 29, 2014) (arguments which are "conclusory and underdeveloped [do] not merit further consideration by the court"). Similarly, plaintiffs'

attempt to substantiate their arguments by way of their reply creates no inclination or obligation on my part to address them.  ***See White v. Chafin***, 862 F.3d 1065, 1067 (10th Cir. 2017); ***Hubbard v. Nestor***, 2019 WL 339823 at *1 (D. Colo. Jan. 25, 2019).

Accordingly, I overrule plaintiffs' objections and will consider the documents if and where appropriate.

### B.  Statute of Limitations

In certifying this matter as a class action, I defined all three subclasses to commence on January 1, 2009, noting it was premature to determine at that juncture whether plaintiffs could establish facts sufficient to toll limitations.  (***See* Order Re: Plaintiffs' Motion for Class Certification** at 4-5 [#119], filed January 30, 2018.)  I now find and conclude plaintiffs have failed to adduce sufficient evidence in that regard. Accordingly, any claim based on conduct occurring before January 22, 2010, is time-barred.

ERISA provides that

> [n]o action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of – (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation. . . .

29 U.S.C. § 1113(1).  This provision is a statute of repose, which ordinarily operates to "extinguish a plaintiff's cause of action whether or not the plaintiff should have discovered within that period that there was a violation or an injury."  ***Fulghum v. Embarq Corp.***, 785 F.3d 395, 413 (10th Cir. 2015) (citation and internal quotation marks

omitted).  However, Congress has provided an exception under which, "in the case of

fraud or concealment," a civil enforcement action "may be commenced not later than six

years after the date of discovery of [the] breach or violation."  29 U.S.C. § 1113.  In

creating this exception, Congress "effectively restored the judicial doctrines of equitable

tolling and equitable estoppel to selected ERISA breach of fiduciary duty claims."

*Fulghum*, 785 F.3d at 416.

Because the term "concealment" is not defined in ERISA,[5] the court relies on the

ordinary meaning of the term at the time Congress enacted the statute.  *Id.* at 415.

Thus, "concealment" is the withholding "of that which should have been disclosed, which

deceives and is intended to deceive another so that he shall act upon it to his legal

injury or when the defendant conceals the alleged breach of fiduciary duty."  *Id.*

Plaintiffs argue that this standard is met here because (1) the Plan's 2009 IRS Form

5500 did not reveal the amount of Fidelity's compensation; and (2) the Plan's 2012

Participant Fee Disclosure represented that "no plan administrative fees were to be

deducted from accounts in the Plan."  Neither argument has traction.

Plaintiffs' suggestion that the Plan's Form 5500 did not report the amount of

Fidelity's compensation is simply wrong.  By directing the court to a single line in that

173-page document (*see* **Resp. App.**, Exh. 68 [#154-69] at 5) – which itself

acknowledges the Plan paid Fidelity both direct *and indirect* compensation – plaintiffs

conveniently ignore the remainder of the document, which substantiates the amount of

"eligible indirect compensation," including revenue-sharing, paid to Fidelity (***see id.*** at 7-

---

[5]  Plaintiffs neither argue nor attempt to substantiate that defendants committed any type of fraud
sufficient to toll limitations under the statute.

173). Plaintiffs do not suggest or circumstantiate that the information therein provided was inaccurate or that the Plan otherwise failed to provide any other information the form required. There thus is no evidence of concealment. Moreover, the named plaintiffs have acknowledged they never saw this form. (*See* **Motion App.**, Exhs. B.5 [#134-10] at 39, B.6 [#134-10] at 45-47, B.7 [#134-10] at 52-53, B.8 [#134-10] at 59-60, B.9 [#134-10] at 65-67, & B.10 [#134-10] at 72-73.) They can hardly have relied on or been deceived by the form under those circumstances. *See Jacobs v. Verizon Communications, Inc.*, 2017 WL 8809714 at *15 (S.D.N.Y. Sept. 28, 2017).

The representation in the Participant Fee Disclosure that "no plan administrative fees were to be deducted from accounts in the Plan" is similarly taken out of context, and inaccurate in any event. The statement itself was made in a subparagraph discussing *direct* deductions from individual accounts. As explained more fully below, revenue-sharing is an alternative to such direct charges to Plan participants. Morever, this language was included in a larger section entitled "Fees and Expenses," which addressed the type of fees to which participant accounts might be subject, including, particularly, "asset-based fees," and explained how such fees were calculated and paid. (*See* **Partial Opp. to Motion for Class Cert. App.**, Exh.A.3 [#107-1] at 46-47.) Specifically, the document informed participants that "asset-based fees are reflected as a percentage of assets invested in the option and often are referred to as an 'expense ratio.'" (*Id.* at 47.) The tables which followed then disclosed the expense ratios for each of the investments offered by the Plan. (*See id.* at 48-52.) Plainly, these matters were not concealed.

Finally, plaintiffs have offered no argument or evidence suggesting defendants concealed anything related to the fiduciary breaches alleged in Count II, involving the Plan's allegedly improvident investments in several funds. Those claims, too, therefore will be limited to matters occurring within six years of the date of the filing of this lawsuit.

Accordingly, I find ERISA's statute of repose is applied properly here to limit plaintiffs' claims to matters occurring on or after January 22, 2010, six years prior to the date the complaint was filed. Defendants' motion for summary judgment is granted to that extent. The class definitions approved in my **Order Re: Plaintiffs' Motion for Class Certification** will be amended to reflect this limitation.

### C. ERISA claims

Under ERISA, plan participants, beneficiaries, and fiduciaries may "bring actions on behalf of a plan to recover for violations of the obligations defined in [29 U.S.C. § 1109]." *LaRue v. DeWolff, Boberg & Associates, Inc*., 552 U.S. 248, 253, 128 S.Ct. 1020, 1024, 169 L.Ed.2d 847 (2008) (citing 29 U.S.C. § 1132(a)(2)). "The principal statutory duties imposed on fiduciaries by [section 1109] relate to the proper management, administration, and investment of fund assets, with an eye toward ensuring that the benefits authorized by the plan are ultimately paid to participants and beneficiaries." *Id.*, 128 S.Ct. at 1024 (citation and internal quotation marks omitted). ERISA's fiduciary's duties are derived from and informed by the common law of trusts, *Tibble v. Edison International*, – U.S. –, 135 S.Ct. 1823, 1828, 191 L.Ed.2d 795 (2015), which are among the highest known to law, *La Scala v. Scrufari*, 479 F.3d 213, 219 (2nd Cir. 2007). Nevertheless, while "the law of trusts often will inform"

determination of issues under ERISA, it "will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 1070, 134 L.Ed.2d 130 (1996).[6]

ERISA imposes on fiduciaries twin duties of loyalty and prudence. *See* 29 U.S.C.A. §§ 1104(a)(1)(A) & (B).[7] *See also Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir.), *cert. denied*, 135 S.Ct. 477 (2014). The burden is on plaintiffs to prove defendants breached their fiduciary duties, resulting in losses to the Plan. *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Truest v. Alerus Financial, N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017), *cert. dismissed*, 139 S.Ct. 50, (2018).

The duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive

---

[6] As the Supreme Court explained,

> [E]ven with respect to the trust-like fiduciary standards ERISA imposes, Congress expect[ed] that the courts will interpret this prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans, as they develop a federal common law of rights and obligations under ERISA-regulated plans. . . . In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements. And, in doing so, courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place.

*Variety Corp.*, 116 S.Ct. at 1070 (citations and internal quotation marks omitted).

[7] Section 1104 imposes additional fiduciary duties not implicated in this matter. *See* 29 U.S.C. §§ 1104(a)(1)(C) (duty to "diversify[] the investments of the plan so as to minimize the risk of large losses"), 1104(a)(1)(D) (duty to act "in accordance with the documents and instruments governing the plan").

purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Generally speaking, this aspect of ERISA prohibits self-dealing and sales or exchanges between the plan and "parties in interest" or "disqualified" persons. *See* 29 U.S.C. § 1106. *See also Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 143 n.10, 105 S.Ct. 3085, 3091 n.10, 87 L.Ed.2d 96 (1985); *Womack v. Orchids Paper Products Co. 401(K) Savings Plan*, 769 F.Supp.2d 1322, 1332 n.7 (N.D. Okla. 2011).

An ERISA fiduciary owes a duty also to plan participants and beneficiaries to discharge his responsibilities using "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C.A. § 1104(a)(1)(B). The appropriate yardstick of a fiduciary's duty of prudence under ERISA "is not that of a prudent lay person, but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *Tibble v. Edison International*, 2017 WL 3523737 at *10 (C.D. Cal. Aug. 16, 2017) (citation and internal quotation marks omitted). The prudent person standard is an objective one which "focuses on the fiduciary's conduct preceding the challenged decision – not the results of that decision." *Tussey*, 746 F.3d at 335 (citation and internal quotation marks omitted). Relatedly, "[b]ecause the fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing, his actions are not to be judged from the vantage point of hindsight." *Chao v. Merino*, 452 F.3d 174, 182 (2nd Cir. 2006) (citations and internal quotation marks omitted). *See also Osberg v. Foot*

***Locker, Inc.***, 138 F.Supp.3d 517, 552 (S.D.N.Y. 2015) ("A court should not find that a fiduciary acted imprudently in violation of ERISA § 404(a)(1)(B) merely because, with the benefit of hindsight, a different decision might have turned out better."), ***aff'd***, 862 F.3d 198 (2nd Cir. 2017). "[S]o long as the prudent person standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable." ***Id.*** (citation and internal quotation marks omitted).

With those standards in mind, I turn to the specific claims asserted in this matter.

1.  Recordkeeping Fees: Count I

Count I of the Amended Complaint focuses on the allegedly excessive fees the Plan paid to Fidelity for its recordkeeping and other administrative services.[8] Fidelity, an industry leader in the market for providing such services, has served as the recordkeeper and administrator for the Plan since 1993. Plaintiffs maintain the portion of the fees paid to Fidelity for its recordkeeping services were excessive and that defendants breached the duty of prudence by failing to monitor those expenses and/or failing to put the Plan's recordkeeping services out for competitive bidding. They further claim defendants retained Fidelity as the recordkeeper despite these shortcomings to advance Oracle's other business relationships with Fidelity, thereby breaching their duty of loyalty as well. I examine these issue in turn.

a.  *Duty of Prudence: Failure To Monitor or Negotiate Fees*

---

[8] Fidelity's services to the Plan include, but are not limited to, effecting participants' investment transactions, tracking participant account holdings and balances, valuing Plan assets, transferring and distributing funds, providing customer service to Plan participants, issuing quarterly statements and other communications, maintaining a Plan website, and providing investor education tools and services. (***See*** **Motion To Dismiss App.**, Exh. C [#36-3] at 23-25, 35-39.)

Plaintiffs first claim defendants failed to monitor the recordkeeping fees the Plan paid to Fidelity, resulting in the payment of excessive fees.  They focus particularly on the recoupment of these fees by Fidelity through "revenue sharing."  Revenue sharing describes an arrangement by which "mutual fund companies pay a portion of the fees they charge investors – fees that are referred to as a fund's 'expense ratio' and that are expressed as a percentage of a fund's assets" – to the Plan administrator.  *Leimkuehler v. American United Life Insurance Co.*, 713 F.3d 905, 909 (7th Cir. 2013), *cert. denied*, 134 S.Ct. 1280 (2014).  There is nothing suspect or improper about revenue sharing *per se*; indeed, it has been described as "a common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans."  *Tussey*, 746 F.3d at 336.[9]  *See also Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (revenue sharing "violates no statute or regulation"), *cert. denied*, 130 S.Ct. 1141 (2010).  However, plaintiffs maintain that allowing Fidelity to recoup recordkeeping fees based on a percentage of the Plan's assets, rather than on a fixed per-participant amount, resulted in unwarranted and excessive increases to Fidelity's compensation as the Plan grew in size, without a corresponding increase in the services rendered.

I find these allegations untenable.  The Committee, together with representatives of Mercer and Fidelity and outside counsel, met at least quarterly.  Mercer produces Quarterly Reports for the Plan which, among other things, report the expense ratios for

_____

[9] "Because a portion of a mutual fund's expense ratio is typically intended to cover the costs of providing the participant-level services that the mutual fund would be furnishing if it were not for [the administrator], the mutual funds are willing to pay some of these fees to [the administrator] as compensation for [the administrator's] provision of these services."  *Leimkuehler*, 713 F.3d at 909.

each fund in the Plan and show the administrative fees paid, both in total and on a per-participant basis. (*See* **Motion App.**, Exh. A.2. at 49.)[10] Fidelity itself provided benchmarking data in 2009, 2010, 2013, and 2016 showing, *inter alia*, the per-participant recordkeeping fees paid to Fidelity, as well as how the total administrative fees the Plan paid compared to those paid by comparable Fidelity clients. (*See* **Motion App.**, Exh. A.17 at 14,16; Exh. A.18 at 14-17; Exh. A.19 at 9-11; Exh. A.20 at 22-23.) In addition, the Plan compared expense data reported in benchmarking surveys prepared by Deloitte & Touche (**Motion App.**, Exhs. A.8, A.9, A.10, A.11, A.15 at 10-15) and the Silicon Valley Employee Forum (**Motion App.**, Exhs. A.12, A.13, A.15).[11]

Plaintiffs argue these actions were insufficient because there is, they claim, little evidence that the Committee ever specifically considered the fees paid to Fidelity on a per-participant basis or requested Mercer perform an analysis of the reasonableness *vel non* of Fidelity's recordkeeping fees on a per-participant basis. Plaintiffs apparently divine this fact from the absence of a specific mention of these issues or documents in the minutes of the Committee's meetings. However, they ignore testimony to the effect that such information, in fact, was reviewed at every quarterly meeting, with no expectation that such review necessarily would be reflected in the minutes. (*See* **Reply App.**, Exh. A.1 at 96-97 ("If that information [revenue sharing, expenses, per-participant

---

[10] The fact that the Committee engaged Mercer, while not dispositive, is some evidence of prudence in itself. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799-800 (7th Cir. 2011) (citing cases).

[11] Although plaintiffs argue the Committee was never provided with these documents (*see* **Resp.** at 21), some of the very same testimony they cite in support of this proposition shows the Committee was, at the least, made aware of the information they contained (*see id.*, Exh. 1 at 49-50, 53-54; Exh. 2 at 132, 166; Exh. 48 at 36).

costs] is presented to the committee as part of its standard reporting, which it generally is, that would not be noted in the minutes. . . . Minutes are topics of discussion and decisions. . . . [T]he minutes are not a blow-by-blow recording of everything that occurs in a committee meeting."); *id.* at 98 (noting "an ongoing discussion about fees which occurs at every meeting . . . It's part of the conversation. . . . It's reviewed every quarter. . . .").) Indeed, it appears abundantly clear the Committee regularly did consider information regarding the Plan's recordkeeping costs as a percentage of total costs, a figure which declined during every year of the class period.[12] Not coincidentally, the per-participant costs also decreased significantly during this time; in 2017, it was $27 per participant. (**Motion App.**, Exh. C ¶¶ 13-14 at 7.)[13] No reasonable jury could find anything imprudent in this decisionmaking process. If anything, it seems exceptionally careful and well-informed. No reasonable jury could find otherwise.

For similar reasons, plaintiffs' related assertion that the Committee was imprudent in failing to negotiate Fidelity's fees does not survive summary judgment. Plaintiffs' arguments regarding this aspect of their claim appear to be based on an amorphous, but artificially narrow conception of what "negotiation" must look like. Whatever plaintiffs feel may have been lacking in the manner by which the Plan secured

---

[12]  These figures were consistent also with those shown in other benchmarking reports for plans of similar size. (***See* Motion App.**, Exh. A.8 at 20, 22; Exh. A.10 at 24-25; Exh. A.13 at 20-21; Exh. A.16 at 10; A.17 at 14, 16; Exh. A.19 at 8-10, 11; Exh. A.20 at 22-23.)

[13]  The Committee also took a number of other actions which reduced overall plan costs, including specifically: making at least 57 fund replacements or share-class changes to the menu of investment options available under the Plan; converting institutional investment options to lower-cost share classes or versions of those funds, in most instances reducing or eliminating revenue sharing payments to Fidelity; introducing lower-cost investment vehicles which did not provide revenue sharing at all; and removing several Fidelity-managed options from the Plan and replacing them with non-Fidelity funds which had lower expense ratios and paid no revenue sharing to Fidelity. (***See* Motion App.**, Exh. C ¶¶ 5-8 at 2-4.)

price concessions from Fidelity related to the cost of its administrative services,[14] the evidence nevertheless demonstrates the Plan did receive significant concessions during the class period.  For example, in 2011, Oracle received an annual expense reimbursement credit of $245,000 to offset administration costs.  (**Motion To Dismiss App.**, Exh. C [#36-3] at 121.)  The following year, the Plan and Fidelity replaced that program with a revenue credit program under which it paid the Plan $4.4 million as a revenue credit and agreed that in the future excess revenues would be credited back to participant accounts on a pro rata basis.  At the same time, the parties agreed to a per-participant fee target of $30.[15]  (**Motion To Dismiss App.**, Exh. C [#36-3] at 133-139; **Motion App.**, Exh. A.3 at 164, 167, 193; Exh. B.3 at 26; Exh. B.4 at 31; Exh. C ¶ 10 at 5.)  In subsequent years, up through 2017, the Plan received an additional $8.9 million from Fidelity under the revenue credit program.  (***See*** **Motion To Dismiss App.**, Exh. C at 142 (August 2013; $5.5 million), 159 (May 2014; $1.25 million); **Motion App.**, Exh. A.21 at 33 (April 2016; $900,00); Exh. A.22 at 35 (June 2017; $1.25 million).)  In addition, Oracle has obtained other fee waivers and cost reductions from Fidelity during the class period.  (***See*** **Motion App.**, Exh. C ¶ 11 at 5.)

---

[14]  The evidence to which plaintiff cites for this proposition is nothing more than a single Committee member's failure to recall whether the Committee ever, at any time, negotiated a fixed-rate per-participant fee with Fidelity.  (***See*** **Resp. App.**, Exh. 3 at 135.)  Aside from the fact that a failure to recall is an exceptionally thin reed on which to argue that "*[a]t no time* has any Plan fiduciary negotiated" such an arrangement (**Resp.** at 5 (emphasis added)), it is belied by plaintiffs' citation – in the same paragraph – to evidence showing that Fidelity set a target fixed-rate per-participant fee in July 2012 (***see id.*** (citing **Motion App.**, Exh. A.25 at 22)).

[15]  That figure was decreased to $28 in 2015.  (**Motion App.**, Exh. B.3 at 26.)  Effective April 1, 2018, the Plan negotiated a flat-rate recordkeeping fee of $27 per participant, which is to be paid from the Plan's forfeiture reserves.  Under that agreement, Fidelity also will rebate all revenue sharing it receives back to the accounts of participants invested in funds paying revenue sharing.  In other words, participants no longer pay for recordkeeping services.  (**Motion App.**, Exh. C ¶ 11 at 5.)

Moreover, even if the Committee had failed in these respects, those failures

alone would be insufficient to create a genuine dispute for trial.  Because the prudence

standard is an objective one, a trustee "is insulated from liability if a hypothetical prudent

fiduciary would have made the same decision anyway."  ***Tussey***, 746 F.3d at 335.  ***See***

***also Tatum v. RJR Pension Investment Committee***, 761 F.3d 346, 366 (4th Cir. 2014)

("[A] fiduciary who fails to 'investigate and evaluate beforehand' will not be found to

have caused a loss if the fiduciary would have made the same decision if he had

"'investigat[ed] and evaluat[ed] beforehand.'"), ***cert. denied***, 135 S.Ct. 2887 (2015)

(citation omitted; alterations in original); ***Fink v. National Savings & Trust Co.***, 772

F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part) ("It

is the imprudent investment rather than the failure to investigate and evaluate that is the

basis of suit; breach of the latter duty is merely evidence bearing upon breach of the

former[.]").   Thus, to get beyond summary judgment, plaintiffs would have to adduce

facts demonstrating that Fidelity's recordkeeping fees were unreasonable compared to

what was available in the market, leading the Plan to suffer compensable losses.  ***See***

29 U.S.C. § 1109(a) (ERISA fiduciary "liable to make good to such plan any losses to

the plan resulting from each such breach . . ."); ***Brotherston v. Putnam Investments,***

***LLC***, 907 F.3d 17, 30 (1st Cir. 2018) (loss is element of claim for breach of fiduciary duty

under ERISA), ***pet. for cert. filed*** (No. 18-926) (Jan. 11, 2019); ***Hart v. Group Short***

***Term Disability Plan For Employees of Cap Gemini Ernst & Young***, 338 F.Supp.2d

1200, 1201 (D. Colo. 2004) ("[L]oss to the plan is an element of any claim under §

1109(a)."). ***See also Pioneer Centres Holding Co.***, 858 F.3d at 1337 (burden is on

plaintiff to prove losses to the plan).

This they cannot do. Plaintiffs' evidence as to the purported unreasonableness of Fidelity's recordkeeping fees is premised on the expert opinion of Michael Geist, who generated a table of what he claimed to be reasonable per-participant recordkeeping fees for each year of the class period, to which he compared the fees paid by the Plan. (**Motion To Strike Expert App.**, Exh. B. [#126-2] ¶ 174 at 67.) However, because Mr. Geist failed to disclose the methodology by which he derived these allegedly more reasonable recordkeeping fees, the court struck these opinions. (*See* **Order Re: Motion To Exclude Proposed Expert Testimony of Michael Geist** at 4-9 & ¶ 1 at 14 [#178], filed January 31, 2019.)

Plaintiffs thus have no evidence to suggest that defendants' alleged lack of prudence caused losses to the Plan. Absent such proof, these aspects of plaintiffs' breach of fiduciary duty claim would fail even if the evidence substantiated an actual lack of prudence on defendants' part, which it does not. Accordingly, defendants are entitled to summary judgment on this aspect of Count I.

b. *Duty of Prudence: Failure To Bid Out Recordkeeping Services*

Plaintiffs also seek to hold defendants liable for failing to put the Plan's recordkeeping services out to a competitive bidding process. According to Mr. Geist, prudent fiduciaries typically solicit such "request for proposals" ("RFPs") from vendors at least once every three years. (*See* **Motion To Strike Expert App**., Exh. B [#126-2] ¶¶ 59-69 at 23-28.) It is undisputed the Plan has not conducted an RFP in connection with the administrative services provided by Fidelity.

While Mr. Geist's opinion is some evidence that prudence requires regular resort to an RFP, it seems somewhat myopic.[16]  For while "cost-conscious management is fundamental to prudence," ***Tibble v. Edison International***, 843 F.3d 1187, 1198 (9th Cir. 2016), ERISA requires fiduciaries to consider factors other than cost as well, ***Sweda v. University of Pennsylvania***, 2017 WL 4179752 at *8 (E.D. Pa. Sept. 21, 2017), ***appeal filed*** (No. 17-3244) (Oct. 13, 2017), and "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)," ***Hecker***, 556 F.3d at 586.

Yet here again, assuming *arguendo* Mr. Geist's opinion on this matter is sufficient to create a genuine dispute of material fact as to liability, without his further opinion that less costly alternatives were available, plaintiffs have no evidence that the Plan could have paid less for recordkeeping services than it did, and therefore that it suffered compensable losses.[17]  Without such evidence of damages, this claim also must fail. ***See Pioneer Centres Holding Co.***, 858 F.3d at 1334-35 (10th Cir. 2017) ("[A] breach of fiduciary duty does not automatically equate to causation of loss and therefore liability and consequently a fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan[.]")) (citation and internal quotation marks omitted).

---

[16]  Moreover, plaintiff's citation to the Department of Labor's 2010 interim rule regarding fee disclosures actually undermines any suggestion that an RFP is the benchmark of prudence.  As defendants explain in reply (***see*** **Reply Br.** at 7-8), the interim rules, ultimately adopted as regulations, were enacted to enforce greater fee transparency from vendors to correct an "information asymmetry" between plans and vendors and thus alleviate the need for plans to "shop for services" at regular intervals simply to ensure that fees were reasonable.  ***See*** 75 Fed. Reg. 41,600, 41,619-620 (July 16, 2010).

[17]  Plaintiffs' argument that the Committee never solicited or received an opinion that Fidelity's fees were reasonable misapprehends the burden of proof.  The Tenth Circuit has made abundantly clear that the plaintiff in an ERISA breach of fiduciary duty suit "assume[s] the burden of proof on each element of its claim."  ***Pioneer Centres Holding***, 858 F.3d at 1337.

Defendants' motion will be granted as to this aspect of Count I as well.

b. *Duty of Loyalty*

As noted above, ERISA fiduciaries also owe a duty of loyalty to participants and beneficiaries, which requires they "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(I). ***See also National Labor Relations Borad v. Amax Coal Co.***, 453 U.S. 322, 332-33, 101 S.Ct. 2789, 2795-96, 69 L.Ed.2d 672 (1981). Plaintiffs maintain defendants breached this duty by allowing the Plan to pay allegedly excessive recordkeeping fees in order to maintain a favorable business relationship with Fidelity, which was also a customer of Oracle. There are at least two problems with this argument.

First, "a conflict of interest is not a per se breach: nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties. Instead, in order to prove a violation of the duty of loyalty, the plaintiff must go further and show actual disloyal conduct." ***In re Northrop Grumman Corp. Erisa Litigation***, 2015 WL 10433713 at *28 (C.D. Cal. Nov. 24, 2015) (citation and internal quotation marks omitted). Here, the disloyal conduct plaintiffs claim is the Committee's alleged failure to secure a lower recordkeeping fee for the Plan. As noted above, plaintiffs have failed to prove that such was the case.

Second, the evidence plaintiffs have adduced shows merely that members of Oracle's sales team and various of its senior management – none of whom were fiduciaries with respect to the Plan or are named defendants in this lawsuit – discussing

among themselves how to leverage Oracle's business relationship with Fidelity. The actions of such non-fiduciaries are irrelevant, however; the "threshold question" under ERISA "is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 21552-53, 147 L.Ed.2d 164 (2000). *See also Hockett v. Sun Company, Inc. (R&M)*, 109 F.3d 1515, 1522 (10th Cir. 1997) ("[N]ot all of an employer's business activities implicate ERISA's fiduciary duties."). Although the sales team's efforts occasionally led to requests for information from the Plan, there is absolutely no evidence of any directives, suspect or otherwise, flowing back from the sales team or senior management to the Plan. At best, plaintiffs can say only that Committee members were "aware" of Oracle and Fidelity's business relationship. (**Resp. Br.** at 8.) To draw any further, more sinister, conclusion would be nothing more than rank speculation, and is therefore insufficient to create a genuine dispute fo material fact for trial. Summary judgment is appropriate as to this final iteration of Count I as well.

    2.  Improvident Investments: Count II

Count II attacks the Plan's selection and retention of three investment options – the Artisan Small Cap Value Fund (the "Artisan Fund"), offered from 2005 to June 2015; the TCM Small-Mid Cap Growth Fund (the "TCM Fund"), offered from November 2009 to April 2013; and the PIMCO Inflation-Response Multi-Asset Fund (the "PIMCO Fund"), included in the plan since 2012. Plaintiffs maintain the Plan failed to engage in a

prudent process for selecting and retaining these particular funds.  More particularly, plaintiffs allege the TCM Fund had an inadequate performance record to warrant its inclusion in the Plan and that all three funds were improvidently retained even after they consistently and dramatically underperformed their benchmarks.

An ERISA fiduciary's duty of prudence contemplates an ongoing obligation to monitor the Plan's investments and remove imprudent ones.  ***See Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers Retirement Plan v. Moran Stanley Investment Management, Inc.***, 712 F.3d 705, 716-17 (2nd Cir. 2013).  ***See also Tibble***, 843 F.3d at 1197 (fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset"); ***Armstrong v. LaSalle Bank National Association***, 446 F.3d 728, 734 (7th Cir. 2006) ("A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.").  In determining whether a fiduciary has breached this duty, the court must consider the totality of the circumstances.  ***In re General Growth Properties, Inc***., 2010 WL 1840245 at *6 (N.D. Ill. May 6, 2010).  The prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole.  ***Pension Benefit Guaranty Corp***., 712 F.3d at 716-17; ***California Ironworkers Field Pension Trust v. Loomis Sayles & Co.***, 259 F.3d 1036, 1043 (9th Cir. 2001); ***Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.***, 173 F.3d 313, 322 (5th Cir.), ***cert. denied***, 120 S.Ct. 406 (1999).

This duty is one of prudence, not prescience, ***see Pension Benefits Guaranty***

*Corp.*, 712 F.3d at 716, and "a named fiduciary is not required to ensure the performance of a given plan investment," *DiFelice v. US Airways, Inc.*, 397 F.Supp.2d 758, 773 (E.D. Va. 2005). Hindsight, therefore, is to be avoided. The court "cannot rely, after the fact, on the magnitude of the decrease in the [investment's] price; rather, [it] must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed." *In re Citigroup ERISA Litigation*, 662 F.3d 128, 135 (2nd Cir. 2011), *cert. denied*, 133 S.Ct. 475 (2012), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014).

Instead, the court should "focus on a fiduciary's conduct in arriving at an investment decision" and "ask whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment," *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 434 (3rd Cir.), *cert. denied*, 117 S.Ct. 56 (1996). Compliance with this duty requires a fiduciary, at a minimum, "to examine the characteristics of an investment, including its risk characteristics and its liquidity, to ensure that it is an appropriate plan investment, and that it is in the best interests of the plan participants." *DiFelice*, 397 F.Supp.2d at 773. *See also* 29 C.F.R. § 2550.404a-1(b)(2)(I) (fiduciary discharges investment duties prudently when he "[h]as given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment

portfolio with respect to which the fiduciary has investment duties."). Moreover, the fiduciary should "systematic[ally] conside[r] all the investments of the trust at regular intervals to ensure that they are appropriate." *Tibble*, 843 F.3d at 1197 (citations and internal quotation marks omitted; alterations in original).

    a. *Structure of the Plan's investment portfolio*

Given these standards, I look first at the general makeup and management of the Plan's investment portfolio. As of March 2018, the Plan provided 32 variable return investment options in four broad categories.[18] Participants are provided information regarding the one, five, and ten year average annual total return of each option, as well as its annual gross expense ratio and whether the fund imposes restrictions on excessive trading or other types of restrictions. (**Motion App.**, Exh. A.2 [#134-2] at 15-20.)

The Committee makes investment decisions for the Plan pursuant to the IPS, which articulates a number of qualitative and quantitative performance standards and sets out procedures whereby funds that fail to meet them may be placed on a "watchlist" and subject to "additional due diligence to determine the ongoing suitability of the option." Nevertheless, the Committee retains discretion to "retain an investment option whose performance falls outside of the performance standards or remove or change an investment option that satisfies all standards, if the committee concludes that such circumstances exist which would warrant such action." (*See* **Motion App.**, Exh. A.4 [#134-2] at 272-273.)

---

[18] Additional investment options, which are not monitored by the Plan, are available through Fidelity's brokerage window.

As noted previously, the Committee relies on assistance and advice from its independent consultant, Mercer, to monitor and manage the Plan's investments. Mercer provides the Committee with quarterly reports and participates in and presents at every quarterly meeting, reviewing the performance of investments relative to benchmarks, assessing market trends effecting the Plan, and addressing potential changes in the investment lineup. From 2009 to 2017, the Committee made at least 57 fund replacements or share-class changes to the menu of investment options available to Plan participants. (**See Motion App.**, Exh. C ¶¶ 5-8 at 3-5, ¶ 13 at 7.)

Given that background, I now examine each of the three specifically challenged funds.

b. *The PIMCO Fund*

I previously refused to certify a class related to the PIMCO Fund, noting that no named class representative had invested in that fund. (**See Order Re: Plaintiffs' Motion for Class Certification** at 14-15 [#119], filed January 30, 2018). An ERISA plan participant and beneficiary has standing to file suit only insofar as he seeks "to recover benefits due to him under the terms of his plan . . ." **Yarbary v. Martin**, 643 Fed. Appx. 813, 816 (10th Cir. April 1, 2016) (quoting 29 U.S.C. § 1132(a)(1)). The plaintiff therefore must establish individual standing by asserting a direct injury. **See Loren v. Blue Cross & Blue Shield of Michigan**, 505 F.3d 598, 608-09 (6th Cir. 2007) (citing cases).

Plaintiffs have failed to do so here, either for themselves individually or for the class as a whole. Indeed, plaintiffs essentially concede this argument by failing to

address it at all in response to the motion for summary judgment.  I therefore grant the motion insofar as it implicates the PIMCO Fund.

### c.  *The Artisan Fund and the TCM Fund*

As for the other two funds plaintiffs challenge – the Artisan Fund and the TCM Fund – although defendants have presented voluminous and arguably compelling evidence suggesting they undertook thorough, informed, and reasonable approaches in deciding both whether to invest in these funds initially and whether and when to divest once they began to underperform, the expert opinions of Gerald Buetow are to the contrary.  Defendants have not challenged these opinions, and they are sufficient to create genuine disputes of material fact for trial.  (*See* **Resp. App.**, Exh. 72 [#154-73].)[19]

Nevertheless, because I have found that any claim accruing before January 22, 2010, is time-barred, plaintiffs' claim implicating the allegedly imprudent decision to include the TCM Fund in the Plan may not proceed.  An ERISA claim must be brought within six years of " the last action which constituted a part of the breach or violation."

---

[19]  It seems resolution of this issue may come down to whether the Committee was prudent to rely on the advice of its independent consultant, Mercer.  While obtaining and following such advice "is certainly evidence of prudence, it is not sufficient to entitle defendants to judgment as a matter of law." *George*, 641 F.3d at 799.  *See also Gregg v. Transportation Workers of America International*, 343 F.3d 833, 843 (6th Cir. 2003) ("Independent expert advice is not a 'whitewash[.]'") (citation omitted); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000) ("ERISA] fiduciaries may not . . . rely blindly on [expert] advice.") *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983) ("An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled."), *cert. denied*, 104 S.Ct. 3533 (1984).  Instead,

> [a] determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand.

*Bussian*, 223 F.3d at 301.

29 U.S.C. § 1113(1)(A). Here, the alleged breach was the inclusion of the TCM Fund in the Plan. That decision was consummated in November 2009.[20] It therefore is time-barred. However, plaintiffs' further challenge to the allegedly imprudent decision to *retain* the TCM Fund despite its poor performance implicates events which occurred after the limitations accrual date. That much of their claim implicating the TCM Fund therefore remains viable.

Accordingly, I grant the motion for summary judgment as to Count II insofar as it implicates the initial decision to include the TCM Fund in the Plan. The motion as to this count is denied as to allegations implicating the Artisan Fund and the decision to retain the TCM Fund.

### 3. Derivative Claims: Counts III & IV

Counts III and IV are derivative of the first two counts. In Count III, plaintiffs allege Oracle failed to adequately monitor the actions of other plan fiduciaries, by (1) failing to ensure the Committee employed a prudent process for evaluating the Plan's recordkeeping fees; and (2) failing to recognize the breach of fiduciary duty caused by the selection and retention of poor-performing investment options. Count IV contends that by engaging Fidelity for unreasonable compensation and offering imprudent investments, defendants caused the Plan to directly or indirectly furnish services to a party in interest, in violation of 29 U.S.C. § 1006(a)(1)(C), and/or to transfer Plan assets

---

[20] This fact distinguishes this case from the decision in *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014), which plaintiffs cite for the proposition that the last operative fact occurs when the assets of a former fund are "mapped" onto the new, allegedly imprudent, one. *See id.* at 337. The case makes no such broad pronouncement. Instead, the court there was addressing a claim specifically related to the mapping of Plan assets from a prior investment onto a new one. Plaintiffs' claim related to the TCM Fund focuses instead on the actual selection of that investment for inclusion in the Plan, an action which was completed prior to the operative limitations date in this case.

to a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

To the extent these claims are based on allegations that the Plan's recordkeeping fees were excessive, they fail together with the substantive claim in Count I. The motion for summary judgment will be granted as to those aspects of these claims. Summary judgment likewise is appropriate insofar as these claims are premised on the allegedly imprudent investment in the PIMCO Fund and the time-barred aspect of the claim related to the TCM Fund alleged in Count II.

Insofar as Count III is based on the allegedly imprudent investment in the Artisan Fund and the allegedly imprudent retention of the TCM Fund, defendants argue only that the claim fails for the same reasons as its substantive counterpart in Count II. As I have denied summary judgment as to these aspects of Count II, this argument is moot. The motion therefore will be denied as to Count III to the extent that claim is based on the investment in the Artisan Fund and the non-time-barred aspects the claim implicating the TCM Fund.

Count IV alleges a "prohibited transaction" claim. Section 1106(a)(1)(D) of ERISA provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). ERISA defines a "party in interest" as one who "provid[es] services" to an ERISA plan. 29 U.S.C. § 1002(14)(B).

In response to defendants' motion for summary judgment, plaintiffs focus exclusively on the fee claims alleged in Count I, as to which summary judgment is appropriate, and argue that Fidelity constitutes the "party in interest." (*See* **Plf. Resp.** at

25-26.)  They fail to address, much less explain, how any Plan fiduciary engaged in a prohibited transaction with respect to the decisions to retain the Artisan Fund or the TCM Fund.  There is no evidence suggesting that Fidelity was involved with either of those decisions or has control of or interests in those funds.  The funds themselves are not parties in interest under ERISA.  *See* 29 U.S.C. § 1002(21)(B).[21]  Because plaintiffs have failed to raise a genuine dispute of material fact, I grant defendants' motion for summary judgment as to this claim.

## IV.  CONCLUSION

For the reasons set forth herein, I grant defendants' motion for summary judgment in part and deny it in part.  Based on those rulings, I perceive the claims remaining for determination at trial are (1) the allegedly imprudent investment in the Artisan Fund (Count II); (2) the allegedly imprudent retention of the TCM Fund (Count II); (3) the alleged failure to monitor the breach of fiduciary duty in the retention of these two allegedly imprudent investments.  All other claims in this suit will be dismissed with prejudice.

## V.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendants' Motion for Summary Judgment** [#134], filed April 16, 2018, is granted in part and denied in part, as follows:

    a.  That the motion is granted with respect to the following claims:

        (1) Count I;

---

[21]  Nor is there either evidence or argument to suggest that Mercer might be considered a party in interest.

(2) Count II insofar as it is based on the allegedly imprudent investments in the PIMCO Fund and the decision to include the TCM Fund in the Plan;

(3) Count III insofar as it is based on the allegations of Count I and on the allegedly imprudent investment in the PIMCO Fund and the decision to include the TCM Fund in the Plan alleged in Count II; and

(4) Count IV; and

b. That in all other respects, the motion is denied;

2. That the following claims are dismissed with prejudice:

a. Count I;

b. Count II insofar as it is based on the allegedly imprudent investments in the PIMCO Fund and the decision to include TCM Fund;

c. Count III insofar as it is based on the allegations of Count I and on the allegedly imprudent investments in the PIMCO Fund and the decision to include the TCM Fund in the Plan alleged in Count II; and

d. Count IV;

3. That at the time judgment enters, judgment with prejudice shall enter on behalf of defendants, Oracle Corporation; Oracle Corporation 401(k) Committee; Gayle Fitzpatrick; John Gawkowski; Dan Sharpley; Peter Shott; Mark Sunday; and Amit Zavery, and against plaintiffs, Deborah Troudt; Brad Stauf; Susan Cutsforth; Wayne Seltzer; Michael Harkin; Miriam Wagner; and Michael Foy, individually and as representatives of a class of plan participants, on behalf of the Oracle Corporation

401(k) Savings and Investment Plan, as to the following claims:

   a.  Count I;

   b.  Count II insofar as it is based on the allegedly imprudent investments in
   the PIMCO Fund and the decision to include the TCM Fund in the Plan;

   c.  Count III insofar as it is based on the allegations of Count I and on the
   allegedly imprudent investments in the PIMCO Fund and the decision to
   include the TCM Fund alleged in Count II; and

   d.  Count IV;

3.  That my **Order Re: Plaintiffs' Motion for Class Certification** [#119], filed
January 30, 2018, is amended as follows:

   a.  That the certification of the "Excessive Fee Class" (**see Order** ¶ 2(1) at
   17) is vacated;

   b.  That the definitions of the "Imprudent Investment Class A (Artisan
   Fund)" (**id.** ¶ 2(2) at 18) and the "Imprudent Investment Class B (TCM
   Fund)" (**see id.** ¶ 2(3) at 18) are amended, as follows:

      (1)  **Imprudent Investment Class A (Artisan Fund)**: All Plan
      participants and beneficiaries, excluding defendants, who invested
      in the Artisan Fund between January 22, 2010, and June 22, 2015,
      and whose investment in the Fund underperformed relative to the
      Russell 2000 Index; and

      (2)  **Imprudent Investment Class B (TCM Fund)**: All Plan
      participants and beneficiaries, excluding defendants, who invested
      in the TCM Fund between January 22, 2010, and April 8, 2013, and
      whose investment in the Fund underperformed the Russell 2500
      Growth Index;

4.  That the objections stated in **Plaintiffs' Objections to Untimely Produced**

**Documents Relied on by Defendants in Their Motion for Summary Judgment**
**[#134]** [#155], filed May 22, 2018, are overruled; and

    5.  That on **March 18, 2019**, at **10:30 a.m.** (MDT) counsel for the parties shall contact the court's administrative assistant at (303) 335-2350 to schedule this matter for a combined Final Pretrial Conference and Trial Preparation Conference and trial.

    Dated March 1, 2019, at Denver, Colorado.

                            **BY THE COURT:**

                            Robert E. Blackburn
                            United States District Judge